UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID STEBBINS,                                                              PLAINTIFF

VS.                              Case  **24 - - 1 1 7 3**

JOHN DOE, d.b.a. SKIBBITY DIBBITY                                       DEFENDANT

## COMPLAINT

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following complaint for copyright infringement.

### I: PRELIMINARY MATTERS

### I-1: Related Cases

1. The following cases are tangentially related to this case, so the Court may choose to keep them on hand when reviewing this case:

#### I-1-A: The Subpoena case

2. First, there is Case 1:24-mc-478 in the US District Court for the District of Delaware ("the subpoena case").

3. In that case, I am seeking to obtain a supboena under 17 USC § 512(h) to identify three individuals, one of them being the defendant in this case.

#### I-1-B: The ImperialSalt case

4. Second, there is Case 3:22-cv-04082-AGT in the US District Court for the Northern District of California ("the ImperialSalt case").

5. That case is related to this one because, like in this case, I filed suit initially against a John Doe defendant in a federal district which had personal jurisdiction over the ISP rather than the direct infringer, obtained a supboena under 17 USC § 512(h), and then, when the defendant appeared in the case and it was revealed he was from a different district, the case was transferred to that district, where the parties proceeded to settle out of court. I propose that the Court in this case follow a similar procedure so Defendant Skibbidy Dibbity can be served with process.

#### I-1-C: The SidAlpha case

6. Third and finally, there is Case 3:23-cv-00321-MMC in the US District Court for the Northern District of California ("the SidAlpha case").

7. That was a slander case, not a copyright infringement case, but in ¶¶ 50-57 of the Complaint (ECF 1) in that case, I sued the defendant for slandering me regarding the very case and controversy I seek to sue over in this case.

FILED

OCT 2 1 2024

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## I-2: Identities of the Parties

8.    I am a YouTuber and Twitch streamer who goes by the alias "Acerthorn." My YouTube channel can be found at the url of **www.youtube.com/@acerthorn**, and my Twitch channel can be found at the url of **www.twitch.tv/acerthorn**.

9.    The Defendant is an unknown person who goes by the online alias "Skibbidy Dibbity." His YouTube channel can be found at the following url:

**https://www.youtube.com/channel/UCNC53vBehv5teCHtbM_24zw**

10.    I do not currently know the defendant's name or address. However, I am currently looking to supboena him in the supboena case mentioned above. If, after the subpoena is issued, Google still cannot identify the defendant for me, he can be served with process via email[1] at the email addresses of thedropoutscout@gmail.com and/or skibbityviddity@gmail.com.

## I-3: Jurisdiction and Venue

11.    This Court has subject matter jurisdiction over this dispute because it is a case for copyright infringement, thereby creating federal question jurisdiction.

12.    This Court has personal jurisdiction because this case is related to the supboena case mentioned above, which is also pending before this Court. Barring that, this Court explicitly invited me to file this lawsuit in Dkt. 6 in the subpeona case. On October 11, 2024, I called the Clerk's Office and asked what this letter meant, and they told me to simply file this lawsuit to prevent the statute of limitations from expiring. This call was recorded, and you can listen to it here: **www.youtube.com/watch?v=rolFfPhUIDU**. So even if the related case does not give this Court personal jurisdiction here, the fact that I am filing it pursuant to this Court's express invitation certainly does.

## II: FACTS OF THE CASE

13.    The following facts are necessary to understand the case:

### II-1: My Job as a YouTuber and Twitch Streamer

14.    As a YouTuber, my job is to create videos and upload them to YouTube. I am a member of the YouTube Partner Program, which means that, whenever advertisements play on my videos, I am eligible to receive a portion of that revenue. The more views my videos get, the more ad impressions get shown to viewers, which in turn increases my ad revenue. As such, everything I do as a YouTuber should be geared towards getting more views on my videos.

15.    Youtube has an extremely complex algorithm that is used to determine how many views

---

1    Federal district courts are allowed to authorize service of process under any method otherwise permissible in that state's rules of civil procedure. See Fed.R.Civ.P. 4(e)(1). In Delaware, service of process can be conducted in any manner proscribed by the court. See Del.R.Civ.P. 4(f)(1)(II)(vi). In other states that have similar language int heir rules of civil procedure (such as California), federal courts have interpreted that as giving them discretion to authorize service of process by email. See Miller v. Ceres Unified Sch. Dist., No. 15-cv-0029, 2016 WL 4702754, at *3 (E.D. Cal. Sept. 7, 2016).

my videos get. While nobody except the highest-ranking employees at YouTube know exactly how the algorithm works, the general consensus is that the following factors are the most important:

- **Click-through Rate**: Whenever a video's thumbnail and title is shown to a viewer with the chance to click on it to watch the corresponding video, that is known as an "impression." The percentage of impressions that result in a click is known as the click-through rate, or CTR for short.
- **Average view duration**: Whenever a viewer watches long stretches of a video, that is typically a good sign that the video is itneresting to them and keeps their attention.
- **Binging**: If you not only watch the entirety of a video (thereby giving it 100% average view duration), but then *immediately* click on another video from the same channel and watch it as well, that typically results in far more algorithmic support than if those same two videos were watched with a period of time in between, all else being equal.
- **Engagement**: Comments, likes, even dislikes all count as engagement for purposes of algorithmic support. While not as important as CTR or watch time, the general consensus is that engagement will keep people on the site longer, thereb viewing more ads.

16.     As such, everything I do as a YouTuber should be geared towards improving my overall algorithmic support. However, in order to get algorithmic support, the views, watch time, and engagement (e.g. comments) all have to happen *on my YouTube channel*. If the watch time and engagement happens on any other channel, YouTube obviously cannot attribute that to my channel, which means my channel does not grow, get more viewers, and ultimately get more revenue.

### II-2: The December 18, 2021 Livestream Debate

17.     In the fourth quarter of 2021, I entered into an agreement with the defendant to do a livestream debate on my Twitch channel where he would debate me regarding my opinion of the video game "Fallout: New Vegas." We had this debate on December 18, 2021. It was broken up into two parts with a 1-hour lunch break in between. The two parts can still be seen at the following URLs:

- Part 1: **https://www.twitch.tv/videos/1236975840**
- Part 2: **https://www.twitch.tv/videos/1237211543**

18.     After the stream ended, I transferred the stream to my YouTube channel, combining the stream into one part and reducing all ad breaks to only one second each. The URL for this archive of the stream can be seen at the following URL:

- **https://www.youtube.com/watch?v=o08YPDNQ2yk.**

19.     The Defendant provided some vocal work for the debate, but I alone streamed the work. Therefore, I alone fixed the debate into a tangible medium of expression (or TME, for short). Therefore, I am the sole author (and, therefore, the sole copyright holder) of this stream.

20.     The stream did not end amicably. It ended with me being upset at him and hanging up our call while still streaming, and then ending the stream.

21.     On December 22, 2022, I registered the copyright for this stream. The registration number is PA0002336336. This was only four (4) days after the stream's first publication on Dec. 18.

### II-3: Defendant's Reposting

22.     On December 20, 2021, the Defendant contacted me over email, stating the following:

> "Hey just wanted to say I uploaded the stream on my channel and because I was part of the stream you literally cant do anything to me so dont expect to take it down. Oh and youre a coward silencing people and hanging up on me."

23.     In other words, the Defendant appears to believe that, simply because he was "part of the stream" (aka that he provided some vocal work for it), that automatically makes him a co-author and, therefore, entitled to repost or license the distribution of the stream at his discretion, and I cannot stop him.

24.     Moreover, it was clear that his intention with reposting the stream was not to share in the profits (like actual co-authors and business partners are supposed to do), but to simply steal views from me without giving me anything in return. This is further evidenced by another email he sent me later that same day, which stated, among other things, that I "will never get any further unless [I] decide to viewbot."

25.     I found where he reposted the stream. If the video were still up, it could be seen at the following URL: **https://www.youtube.com/watch?v=qJMhOYwR_CO**.

26.     I downloaded the video for evidenciary purposes. In the first few seconds of the video, you can even see the overlay that plays on Twitch, showing the timestamp and progress bar at the bottom. Meanwhile, at timestamp 4:00:05 of this reposting, you can even see a mouse pointer in the bottom-left corner of the screen clicking the play icon to begin Part 2 of the stream.

27.     In other words, the defendant got this video to repost by playing the 2-part stream on Twitch that I provided links to in ¶ 17 above, and using screen capture software to record that playback. This proves what I said in ¶ 19 above, that he never participated in fixing the work into a tangible medium of expression. He had to use my TME to be able to repost the debate, because he didn't have a TME of his own!

28.     I immediately issued a DMCA Takedown against the video. On December 21, 2021, I received a notification from YouTube that the infringing video had been removed.

### II-4: Harassment I have endured

29.     The Defendant was furious that I had removed his reposting of the stream, and began sending me a barrage of emails cussing me out and hurling various invectives at me for what he perceived to be a "false claim." Among the insults he threw at me include, but are not limited to, "idiot," "sperg," "lunatic," "coward," "disgrace," "loser," "manchild," and "pathetic douche."

30.     He also enlisted multiple other people to harass me on his behalf, arguing that he was indeed a co-author. This culminated in the slander video that SidAlpha publised about me, which I discuss in Sec. 1-1-C above, when I discuss the SidAlpha case. The stress from this harassment

ultimately lead to me suffering a life-threatening case of pneumonia that hospitalized me for eight days. See ¶¶ 132-141 of the Complaint in the SidAlpha case for more details.

### III: ARGUMENT & LAW

31. For the following reasons, I am entitled to prevail for copyright infringement:

### III-1: Copyright Infringement

32. "The test for copyright infringement is well-established. There are two essential elements: ownership of copyright, and copying by the defendant." See Dam Things From Denmark v. Russ Berrie & Co. Inc., 290 F. 3d 548, 561 (3rd Cir. 2002).

33. The factual allegations of Sec. II-2 above sufficiently establish ownership of copyright. Furthermore, because I have a valid registration that was filed within five years of the date of first publication, that creates a rebuttal presumption of copyright validity. See 17 USC § 410(c). Meanwhile, the factual allegations of Sec. II-3 above sufficiently allege the second essential element: Copying by the Defendant.

34. Therefore, I have alleged sufficient facts to state a claim for copyright infringement.

### III-2: Joint Authorship

35. The defendant's primary defense on the merits is most likely going to be that he is a joint author and, therefore, is authorized to repost the stream. I have two rebuttals to that argument, one of which has already been alluded to.

36. First, he is not a co-author because, as I've alluded to earlier in this Complaint, he never participated in creating the TME. Even when he reposted the stream, he had to use screen capture to record my archive of the stream because he didn't have his own TME he could use.

37. Because the TME is my creation and mine alone, that means I am the sole author and, therefore, the sole copyright holder. See Community for Creative Non-Violence v. Reid, 490 US 730, 737 (1989) ("As a general rule, the author is … the person who translates an idea into a fixed, tangible expression entitled to copyright protection"). Garcia v. Google, Inc., 786 F. 3d 733, 744 (9th Cir. 2015) (citing Community for Creative Non-Violence v. Reid) ("Garcia's copyright claim faces yet another statutory barrier: She never fixed her acting performance in a tangible medium, as required by [copyright law] … For better or for worse, Youssef and his crew 'fixed' Garcia's performance in the tangible medium … However one might characterize Garcia's performance, she played no role in fixation").

38. That latter case law is from the 9th Circuit, so it is not binding precedent here, but Community for Creative Non-Violence v. Reid is from the Supreme Court, so it's still binding here. Besides, earlier in the opinion, the Garcia court gave a compelling argument for why this Court *should* adopt the same precedent:

> "In Aalmuhammed, we concluded that defining a 'work' based upon 'some minimal level of creativity or originality' would be too broad and indeterminate to be useful. Our animating concern was that this definition of 'work' would

fragment copyright protection for the unitary film... into many little pieces:

> So many people might qualify as an 'author' if the question were limited to whether they made a substantial creative contribution that that test would not distinguish one from another. Everyone from the producer and director to casting director, costumer, hairstylist, and 'best boy' gets listed in the movie credits because all of their creative contributions really do matter.

> Garcia's theory of copyright law would result in the legal morass we warned against in Aalmuhammed—splintering a movie into many different 'works,' even in the absence of an independent fixation. Simply put, as Google claimed, it 'makes Swiss cheese of copyrights.'

> Take, for example, films with a large cast—the proverbial 'cast of thousands' — such as Ben-Hur or Lord of the Rings. The silent epic Ben-Hur advertised a cast of 125,000 people. In the Lord of the Rings trilogy, 20,000 extras tramped around Middle-Earth... Treating every acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra: copyright of thousands.

> ...

> The reality is that contracts and the work-made-for-hire doctrine govern much of the big-budget Hollywood performance and production world. Absent these formalities, courts have looked to implied licenses. Indeed, the district court found that Garcia granted Youssef just such an implied license to incorporate her performance into the film. But these legal niceties do not necessarily dictate whether something is protected by copyright, and licensing has its limitations. As filmmakers warn, low-budget films rarely use licenses. Even if filmmakers diligently obtain licenses for everyone on set, the contracts are not a panacea. Third-party content distributors, like YouTube and Netflix, won't have easy access to the licenses; litigants may dispute their terms and scope; and actors and other content contributors can terminate licenses after thirty five years. Untangling the complex, difficult-to-access, and often phantom chain of title to tens, hundreds, or even thousands of standalone copyrights is a task that could tie the distribution chain in knots. And filming group scenes like a public parade, or the 1963 March on Washington, would pose a huge burden if each of the thousands of marchers could claim an independent copyright."

See Garcia, supra at 742-43 (cleaned up)

39.     So as this Court can clearly see, holding that I am the sole copyright holder of this stream is the only legal conclusion the Court even can come to that would not be patently absurd and send whole industries that rely on copyright (not just movies, but also news reporting and many others) into a legal death spiral.

40.     But even barring that, even if the defendant does manage to prevail on the claim that he is a co-author, that still does not give him the right to do what he did. While he may have the right,

if he is a co-author, to distribute the stream, and I may not be able to stop him, per se, his actions would still be illegal due to one little nuance in the law that he overlooked: He would still owe me half the revenues from the distribution.

41.     Even if the Defendant himself never personally received any revenues from him posting the stream to his own YouTube channel, YouTube themselves still would have profited from it. Beginning in November 2020, YouTube began putting ads on all videos, regardless of whether the corresponding channels were part of the YouTube Partner Program. [2] So as long as YouTube was profiting off the Defendant posting the video, I am still entitled to have of that revenue, and if the Defendant isn't personally seeing any of that revenue, then he owes me that money out of his own pocket.

42.     Obviously, that was not the defendant's intention. As I explained in ¶ 24, his goal was never to "share" or "play fair" with me. His goal was to sabotage my success on YouTube by taking the views, watch time, and engagement (as explained in Sec. II-1 above) for himself while giving me nothing in return. But as I just explained, even if he were a co-author (which he isn't), such a goal would still have been illegal under copyright law.

### III-3: Other defenses

43.     No other defenses are worth even nominally considering. The defendant reposted the entire stream verbatim with no alterations or modifications whatsoever, so there is no case that can be made for fair use. The archival defense under 17 USC § 108 is only available to libraries and archives, not random individuals[3]. The stream certainly contains minimal creative spark and thus is eligible for copyright protection in the first instance. Nor is the copyright in the public domain.

44.     Furthermore, since his belief that he was a co-author was a mistake of law (misinterpreting the legal definition of an author to include anyone who provided any creative input), rather than a mistake of fact, there is little chance he will be eligible for the "innocent infringement" defense. In fact, the factual allegations in ¶ 24 and ¶ 42 above should have the opposite effect: Increasing the maximum statutory damages up to $150,000 and also preventing him from discharging the debt in bankruptcy under 11 USC § 523(a)(6).

45.     So in conclusion, the defendant has no defenses available to him.

### IV: RELIEF REQUESTED

46.     I hereby request the following relief from the defendant:

### IV-1: Declaratory Relief

47.     First, I seek a declaratory judgment that ...

(a)     The copyright to my December 18, 2021 livestream was unlawfully infringed upon by the defendant; and

---

2   See www.cnbc.com/2020/11/19/youtube-will-put-ads-on-non-partner-videos-but-wont-pay-the-creators.html.

3   For more details, see ¶¶ 36-37 of ECF 38-8 (Memorandum in Support of Motion for Default Judgment) in the ImperialSalt case.

(b) The infringement was done willfully and maliciously to keep me from profiting off of the video, stunting my YouTube channel growth by starving my video of algorithmic support.

48. The second declaration not only enables the Court to award statutory damages of up to $150,000, pursuant to 17 USC § 504(c)(2), but also ensures that the defendant cannot discharge this debt in bankruptcy, pursuant to 11 USC § 523(a)(6).

### IV-2: Statutory Damages

49. Next, I ask for statutory damages of up to $150,000. I registered the copyright four days after the date of first publication, well within the three month time limit set forth by 17 USC § 412(2), so I am entitled to recover statutory damages.

50. I also ask for costs incurred in bringing this claim.

### IV-3: Injunctive Relief

51. I also ask that the Defendant be ordered to cease and desist distributing any copies of the stream, pursuant to 17 USC § 502.

52. Furthermore, I ask that the Court order the Defendant, pursuant to 17 USC § 503, to surrender all of his computers, smartphones, and other devices which have the potential to have this stream stored onto it, to a computer forensics expert of the Court's choosing, so that they may be permanently and irreversibly purged of any/all instances of my copyrighted content from them. The defendant should be made to bear the costs in the first instance of this impounding.

### IV-4: Other Relief

53. I also ask for whatever other relief the Court, in its discretion, believes I should be entitled to.

### V: CONCLUSION

54. Wherefore, premises considered, I respectfully pray that judgment be entered in my favor, costs incurred be awarded, and for any other relief to which I may be entitled.

So submitted on this, the 18th day of October, 2024.

David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
870-204-6516
acerthorn@yahoo.com